UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARIA BELEN,

                Plaintiff,

      v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.

**MEMORANDUM OPINION
& ORDER**

08 Civ. 10303 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      Plaintiff Maria Belen brings this action pursuant to 42 U.S.C § 405(g), seeking to overturn the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income ("SSI") benefits. Belen and the Commissioner have both moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

      For the reasons set forth below, both motions will be denied, and this case will be remanded for further proceedings.

## BACKGROUND

      On August 27, 2003, Belen filed an application for SSI benefits, alleging that she had become disabled as of October 1, 2002. (R. 118-20) Belen's application was denied on initial review. (R. 48-52) She then requested a hearing before an Administrative Law Judge ("ALJ"). (R. 56) That hearing was conducted on October 20, 2005, and February 22, 2006. Belen appeared pro se. (R. 509-15, 516-33) On May 26, 2006, ALJ Valerie A. Bawolek issued a decision concluding that Belen was not disabled within the meaning of the Social Security Act, and denying her application for SSI benefits. (R. 39-47) Belen then retained counsel and requested review of the hearing decision by the Appeals Council. (R. 108, 111-13) On

November 16, 2006, the Appeals Council vacated ALJ Bawolek's decision and remanded

Belen's case for further proceedings.  (R. 108-09, 114-17)

On June 11, 2007, the remand hearing was held before ALJ Kenneth Scheer.  (R.

469-508)  Belen appeared with her attorney, Ellen Schwartz.  (R. 469)  On October 15, 2007,

ALJ Scheer issued a decision concluding that Belen was not disabled within the meaning of the

Social Security Act, and denying her application for SSI benefits.  (R. 9-18)  Belen again sought

relief from the Appeals Council, but the Council denied her request for review on October 9,

2008.  (R. 3-6, 464-67)

Belen filed this action on November 26, 2008.  Belen claims that she is disabled

as a result of depression, bipolar disorder, chronic lower back pain, and hypothyroidism.  (Cmplt.

¶ 4)

I.   **PERSONAL AND VOCATIONAL HISTORY**

Belen was born on February 21, 1969, in the Bronx, New York.  (R. 118, 121,

475)  She attended school through the ninth grade (R. 48, 137, 144, 475), and can read and write

English.  (R. 140)  As of June 2007, she lived at home with her three children, ages seventeen,

fourteen, and thirteen.  (R. 158, 474)

Belen takes care of her children and helps them with their homework. (R. 159,

478)  She also takes care of herself, prepares her own meals, and does household chores.  (R.

160-61)  Belen also uses public transportation independently and shops for food and clothing

once a month.  (R. 161-62)

Belen was a self-employed babysitter from 1997 to 2000, and also appears to have

worked as a cashier from January 1997 to October 2002.  (R. 473, 141)  In September 2001,

Belen received training to become a home health care aide (R. 137), and she worked in that

capacity during October 2001.  (R. 150)  During 2002, she worked intermittently as a data entry clerk.  (R. 150, 152)

## II.   MEDICAL HISTORY[1]

Belen suffers from chronic lower back pain, hypothyroidism, and depression, in addition to having trouble sleeping.  She suffers from anxiety problems and panic attacks and estimates that she experiences depressive symptoms three times a week.  (R. 480-81)  Belen claims that she "cannot concentrate," "cannot do [her] daily activities without feeling very anxious," and has problems paying attention when people use "big words that [she doesn't] understand."  (R. 140, 164)

### A.   Mental Health Treatment and Evaluation

Belen has no history of psychiatric hospitalizations (R. 16), but she has received out-patient treatment at several facilities.  Dr. Julio Quintanilla of the Urban Health Plan, Inc. saw Belen on March 1, 2003.  Belen told Dr. Quintanilla that she had been feeling depressed for five months.  (R. 344)  Belen was assessed as having a depressive disorder, and was given a trial of Elavil and a psychiatric referral.  (Id.)

Belen received outpatient psychiatric services at the Bronx-Lebanon Hospital Center ( "Bronx-Lebanon") during May and June 2003.  (R. 183-93)  Belen complained of anxiety, a depressed mood, and sleep disturbance, and reported stress related to her husband's incarceration.[2]  (R. 191, 193)  Psychiatrist Kristen Anderson prescribed Hydroxyzine and Zyprexa to help her sleep, and Paxil for her depression.  (R. 133, 136)

---

[1] The ALJ concluded that Belen was not disabled as a result of her physical impairments (R. 14), and Belen has not challenged that finding.  (See Dkt. Nos. 10, 17)  Accordingly, this opinion only addresses Belen's claimed psychiatric impairments.

[2] Belen's husband was convicted of murder and is serving a sentence of life without parole.  (R. 308)

On June 23, 2003, Jack Ellenberg, a Bronx-Lebanon psychiatrist, prescribed Paxil, Zyprexa, and Vistaril for Belen's psychiatric symptoms, and she was put on a treatment plan consisting of bi-weekly medication management and bi-weekly group and individual therapy.  (R. 186-87)  Because of a change in her insurance, Belen then began seeking treatment at South Bronx Mental Health Council, Inc. ("South Bronx Mental").  (R. 183)

On June 27, 2003, a South Bronx Mental psychiatrist diagnosed Belen as having a "[d]epressive disorder" and recommended a clinical rehabilitation plan of one to six months duration.  (R. 235)  A South Bronx Mental therapist then evaluated Belen on August 1, 2003. (R. 204-08)  Belen complained that she was unable to eat or sleep and reported that she was constantly crying.  (R. 204)  She also claimed that her depression was exacerbated by concerns related to her husband's criminal activity and fears that she would lose her apartment.  (Id.)  The therapist opined that Belen had "major depression" and would benefit from psychotherapy and medication.  (R. 205)  In conducting a DSM-IV multiaxial assessment,[3] the therapist listed major depression, single episode for Axis I; husband's incarceration and pending loss of apartment for Axis IV; and a GAF score of 60 for Axis V.[4]  (Id.)

---

[3] The DSM-IV multiaxial scale assesses the mental and physical condition of an individual on five axes:  Axis I refers to clinical disorders, Axis II refers to personality disorders and mental retardation, Axis III refers to general medical condition, Axis IV refers to psychosocial and environmental factors, and Axis V identifies the Global Assessment of Functioning ("GAF") score.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders [hereinafter "DSM-IV"] (4th ed. rev. 2000).

[4] "GAF rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning."  Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2001).  A "GAF [score] in the range of 51 to 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'"  Id. at 406 n.3 (quoting DSM-IV at 34).

4

On August 27, 2003, Belen filed a claim for SSI disability benefits.  (R. 140-49)
Belen listed her medications as Hydroxyzine – "to calm me down" – Paxil – "for the control of
my depression" – and Zyprexa – "to help me sleep."  (R. 143-44)

Shortly thereafter, Belen began participating in South Bronx Mental's Wellness
Program.  (See R. 203, 207)  As part of this program, she was periodically evaluated by Dr.
Norland Berk, an attending psychiatrist at South Bronx Mental.  (R. 198-202, 233-34)  On
October 3, 2003, Dr. Berk described Belen as well-groomed, cooperative, and alert with
appropriate affect and no abnormalities in thought process.  (R. 198-200)  Dr. Berk classified
Belen's disorder as "bipolar disorder, hypomanic," noted her  husband's incarceration and
potential loss of residence on Axis IV, and gave her a GAF score of 50 on Axis V.[5]  (R. 201)

On October 29, 2003, Dr. Carlos Gieseken issued a Mental Residual Functional
Capacity Assessment concerning Belen.  (R. 210-211A)  Dr. Gieseken noted that Belen
complained of depression and was taking Paxil, Depakote, and Zyprexa.  (R. 210A)  He reported
that Belen "has 3 children whom she cares for independently.  She is able to shop and take care
of household chores.  Able to travel independently and use public transportation.  Concentration
and attention somewhat impaired.  Memory, judgement [sic] intact."  (Id.)  Dr. Gieseken also
believed that Belen's statements concerning her impairments were "partially credible but not to
the extent alleged."  (R. 211)  He further opined that she could perform "simple task work."  (Id.)

On February 17, 2004, Dr. Berk completed a Condition Status Report concerning
Belen.  (R. 232)  Dr. Berk diagnosed Belen with "non-optimized" depression and mixed bipolar
disorder, and concluded that she was temporarily impaired for nine months.  (Id.)

---

[5] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) or any serious impairment in social, occupation or
school functioning (e.g., no friends, inability to keep a job)."  DSM-IV at 34.

On February 18, 2004, Belen filed an SSA Disability Report Appeal.  (R. 167-72)

Belen listed her psychiatric medications at that time as Depakote, Geodon, Paxil, Abilify, and

Seroquel.  (R. 169, 174, 178)  Walk-in clinic evaluation forms indicate that Belen's prescriptions

for Paxil, Depakote, and Geodon were refilled in September 2004.  (R. 332)

It is not clear from the record what psychiatric treatment Belen received between

September 2004 and May 2006.

On May 16, 2006, Beatrice Bradshaw of Federation Employment and Guidance

Service, Inc. ("F.E.G.S."), a social service organization funded by New York City's Human

Resources Administration, met with Belen and prepared a comprehensive service plan and

biopsychosocial summary concerning Belen.  Belen reported that she had last seen a psychiatrist

in August 2005 and that she was taking no psychiatric medications.[6]  (R. 244, 252)  She reported

insomnia, poor energy level, and feeling depressed, but no suicidal ideation or homicidal

thoughts.  The service plan indicates that Belen requires three months of outpatient mental health

care treatment before a residual functional capacity or "work determination" can be made.[7]  (R.

243-44)  F.E.G.S. referred Belen to Dr. Mercedes Brito for psychiatric examination.  (Id.)

On June 1, 2006, Dr. Brito conducted an initial psychiatric evaluation of Belen,

and noted that she was cooperative, attentive, and well-oriented, with a full and appropriate

affect.  (R. 363-68)  Dr. Brito found no thought or perceptual disorders.  On Belen's DSM

---

[6]  Belen told F.E.G.S. that she had previously been seeing a therapist and was prescribed
Depakote, Paxil, and Seroquel, but that "she was unable to continue treatment due to her case
being closed [in] [O]ct. 2005."  (R. 252)  The alleged termination of Belen's treatment in 2005 is
not explained in the record.

[7]  "RFC," or residual functional capacity, is "what an individual can still do despite his or her
functional limitations and restrictions caused by his or her medically determinable physical or
mental impairments.  It is an administrative assessment of the extent to which an individual's
medically determinable impairment(s), including any related symptoms, such as pain, may cause
physical or mental limitations or restrictions that may affect his or her capacity to perform work-
related physical and mental activities."  SSR 96-9p, 1996 WL 374185 (July 2, 1996).

assessment, Dr. Brito listed a history of bipolar disorder for Axis I, listed hypothyroidism for Axis II, noted that Belen's husband was in jail on Axis IV, and assessed a GAF score of 60 for the current and previous years on Axis V.  (R. 368)  Dr. Brito prescribed Depakote and recommended psychotherapy.  (Id.)

        After this initial evaluation, Belen attended monthly psychotherapy sessions with Luz E. Vargas, a social worker, in June, July, and August 2006.  (R. 350-62)  Belen told Vargas that she was "very depressed" because her husband had been charged with murder and was serving a sentence of life imprisonment without parole.  (R. 350, 359)  On July 25, 2006, Vargas completed a psychosocial assessment of Belen, reporting that she was well-groomed, fully oriented, and exhibited an appropriate affect.  (R. 354-60)  Vargas opined that Belen's low self-esteem, unemployment, and husband's incarceration contributed to her depression.  (R. 357)  On Belen's DSM assessment, Vargas listed dysthymia[8] under Axis I, dependent personality disorder under Axis II, hypothyroidism under Axis III, noted "husband in jail" on Axis IV, and calculated a GAF score of 60 on Axis V.  (R. 360)

        On August 23, 2006, Vargas and psychologist Arthur Berger of Urban Health Plan completed a Psychiatric/Psychological Impairment Questionnaire concerning Belen.  (R. 261-68)  Using the DSM scale, they assessed dysthymia and bipolar disorder on Axis I, hypothyroidism on Axis III, noted "husband in jail" on Axis IV, and gave Belen a GAF score of 50 on Axis V.  (R. 261)  With respect to prognosis, Vargas and Dr. Berger wrote "not clear."  (R. 261)

---

[8] Dysthymic disorder is a chronic type of depression lasting for at least two years, with less severe symptoms than those experienced by patients with major depression.  DSM-IV at 379-81 ("Usually Major Depressive Disorder consists of one or more discrete Major Depressive Episodes that can be distinguished from the person's usual functioning, whereas Dysthymic Disorder is characterized by chronic, less severe depressive symptoms that have been present for many years.").

Their report indicates that Belen is suffering from sleep and mood disturbance, decreased energy, feelings of guilt/worthlessness, "pathological dependence or passivity," and isolation. (R. 262)  When asked to rate Belen's mental capacity, Vargas and Berger circled the entry for "moderately limited" (R. 263), but when they were asked to rate specific activities related to understanding and memory, concentration and persistence, social interactions, and adaptation, they checked off "markedly limited" for 13 of 20 categories. (R. 264-66)  The report further states that Belen is "unable to be around people or follow a work routine," and that she would miss more than three days of work per month due to her symptoms. (R. 266-68)  Nevertheless, Vargas and Berger did not expect Belen's impairments to last twelve months. (R. 267)  The report lists Belen's medications as Depakote, Paxil, and Ambien. (R. 266)

Belen continued to attend follow-up appointments with Vargas and Dr. Brito.  In sessions with Vargas on September 18, 2006, and January 4, 2007, Belen discussed her husband's incarceration and her children's behavioral problems.  Vargas noted Belen's constricted affect and her sad and anxious mood.  Vargas's assessments ranged from dysthymia to major depression.  As to current medications, however, Vargas listed "none." (R. 303, 308)

At an October 16, 2006 office visit, Dr. Brito observed Belen as having a full affect and intact thought processes.  Her assessment was cyclothymia, a mood disorder.[9]  (R. 304-05)  Dr. Brito prescribed Trazadone, Zoloft, and Depakote, and stopped Ambien. (R. 304)

Dr. Brito met with Belen again on February 17, 2007.  Belen told Dr. Brito that she had not been taking her medications for the past six months. (R. 299)  Belen complained about stress associated with her teenage son.  Dr. Brito's examination of Belen yielded nothing

---

[9]  Cyclothymic disorder is characterized by "a chronic, fluctuating mood disturbance involving numerous periods of hypomanic symptoms and numerous periods of depressive symptoms," but the hypomanic symptoms do not meet the full criteria for a Manic Episode and the depressive symptoms do not meet the full criteria for a Major Depressive Episode.  DSM-IV at 398.

remarkable:  Belen was well-nourished, well-groomed, and cooperative; her thought processes and perceptions were normal; her attention was "good" and her affect was "full range."  Her mood was depressed.  Dr. Brito's assessment was dysthymia and she prescribed Zoloft, Ambien, and Depakote.  (R. 299)

After the February 17, 2007 office visit, Dr. Brito also completed a Psychiatric/Psychological Impairment Questionnaire concerning Belen.  (R. 279-86)  Dr. Brito listed her diagnosis as "major depression, recurrent psychotic," and assessed a current GAF score of 45, with a score of 50 for the past year.  (R. 279)  Dr. Brito rated most of Belen's mental activities as "markedly limited," and stated that she believed that Belen's impairments would last more than 12 months.  (R. 282-85)  Dr. Brito also concluded that Belen was likely to be absent from work more than three times per month due to her symptoms, but that she could perform low stress work.  (R. 285-86)

Vargas's psychotherapy sessions with Belen continued through February, March, and April 2007.  (R. 292-98)  Belen continued to complain about her thirteen-year-old son, who was refusing to attend school, and her sixteen-year-old daughter, who was living with her boyfriend in Belen's apartment.  Belen exhibited a depressed, sad, and anxious mood, and Vargas sometimes noted Belen's constricted affect.  (Id.)  Vargas's assessment during these therapy sessions was "major depression, recurrent psychotic."  She calculated a GAF score of 50-55.  (R. 292, 294, 296, 298)  Vargas's reports from these sessions state, however, that Belen was still not taking any of her psychiatric medications.  (Id.)

Belen's final visit with Dr. Brito – as reflected in the record – took place on March 13, 2008.  Dr. Brito completed another Psychiatric/Psychological Impairment Questionnaire at that time.  (R. 456-63)  Dr. Brito's diagnosis at this time was dysthymia and

bipolar affective disorder in partial remission.  She assessed a GAF score of 50-55.  (R. 456)  Dr. Brito's findings included sleep and mood disturbances, personality change, recurrent panic attacks, manic syndrome, and generalized persistent anxiety.  (R. 457-58)  Dr. Brito concluded that Belen was markedly limited for basic mental activities such as ability to concentrate for extended periods and ability to work in proximity to others without being distracted by them.  (R. 459)  Dr. Brito also stated that Belen had demonstrated "good compliance with treatment."  (R. 456)  Finally, Dr. Brito found that Belen was incapable of even low stress work and would likely miss work more than three times a month due to her symptoms.  Dr. Brito found that Belen's impairments were not expected to last twelve months, however.  (R. 462-63)

### B.   Consultative Examinations

In October 2003 and March 2007, Belen was evaluated by two psychiatrists at the Commissioner's request.  (R. 194-97, 271-77)  Dr. Vadeika examined Belen on October 1, 2003, diagnosing her with depressive disorder and recommending continued anti-depressive therapy. (R. 195)  During the examination, Dr. Vadeika reported that Belen was neatly groomed, alert, attentive, and cooperative, with an appropriate affect.  (R. 194)  He assessed that she had a fair ability to comprehend instructions, but that her concentration was impaired and she was presently less able to respond appropriately to stress or supervision in a work environment.  (R. 194-95)

Dr. Alan Dubro examined Belen on March 17, 2007, diagnosing her with anxiety disorder and recommending continued therapy.  (R. 271-77)  Dr. Dubro listed Belen's psychiatric medications as Depakote, Zoloft, and Ambien.  (R. 272)  Belen told Dr. Dubro that

her medications were helpful in controlling her stress and anxiety.[10]  (R. 271-72)  Dr. Dubro

reported that Belen suffered from a mildly anxious mood but exhibited a full affect and coherent

thought processes.  (R. 272)  He concluded that Belen's abilities to understand, remember, carry

out instructions, and respond appropriately in a work setting were unimpaired.  (R. 273, 275-77)

III.     **THE ADMINISTRATIVE HEARING**

On June 11, 2007, ALJ Kenneth Scheer held a hearing at which Belen and her

attorney, Ellen Schwartz, appeared.  (R. 469)  In addition to Belen, Dr. Peter Sack, a

psychologist, and Raymond Cestar, a vocational expert, testified at the hearing.  (Id.)

A.     **Belen's Testimony**

Belen testified that she is 35 years old and lives in a Bronx apartment with her

three children.  (R. 474-75)  She receives public assistance.  She has not participated in the work

component of the welfare program for mental health reasons.  (R. 475)  Belen traveled to the

hearing alone by public transportation.  (Id.)

Belen testified that she started receiving psychiatric treatment in 2003.  At that

time, Belen's husband was using drugs and was stealing from her.  He was later incarcerated.

(R. 476-77)  Belen discussed the treatment she received from Dr. Berk and social worker Vargas.

(R. 477)  Belen testified that she currently takes Depakote and Zoloft for depression, and

Ambien to help her sleep.  (R. 478)  Belen does the cooking and shopping for her family, but she

only goes to appointments in the morning, because she experiences panic attacks when noisy

children enter the bus in the afternoon.  When Belen does not take her medication, she becomes

annoyed by the sounds of her children fighting in the house.  (R. 478, 480-82)

---

[10] On February 17, 2007, however, Belen had told Dr. Brito that she had not taken any
psychiatric medication for six months (R. 299), and Vargas's reports from February, March, and
April 2007 indicate that Belen was not taking any psychiatric medications.  (R. 292, 294, 296,
298)

Belen's medications and their side effects make her sleepy and tired.  When depressed – which occurs about three times a week – she wants to stay home and in bed without being bothered by anyone, including her children.  (R. 480)  She will clean or watch television all day, and will not go outside unless she has an appointment.  (R. 483)

Belen does not enjoy reading, because of her inability to sit, concentrate, and comprehend.  (R. 482)  She likewise does not engage in any type of exercise.  (R. 483)  Belen's children sometimes have to remind her to take her medication, and she sometimes forgets where she puts her important papers.  (Id.)

When asked "what affects [her] ability to work," Belen testified as follows:

I feel when I go outside I can't be around people.  I just start getting panic attacks and it scares me to go outside.  In order for me to go outside I have to have an appointment or I have to go shopping, but I won't do it alone.  I always have one of my kids with me.
.      .       .        .
I just can't – I just can't be around people right about now, and with the problems that I have with my son. . . . It's just that he don't like going to school, so that's really bothering me right now.
.      .       .        .
I can't concentrate.  I can't sit down and actually do a regular job and I guess that's why I stay home.  I can't – I just can't function right about now.

(R. 481, 483, 484)

The testimony continued as follows:

Q.    Okay.

A.    Not without my medications I can't.

Q.    And with the – if you take the medications?

A.    If I take my medication I be okay until they wear off. . . .

Q.    Okay, but what I want to know is if you took the medication regularly could you then get a job?

A.       Probably not because my medication – I do my medication at night time, so during the day I don't do my medication because it says in the night time, but during the day is when I can't – I can't concentrate, I can't function unless if I took my medication the day after.

(R. 484-85)

B.   **Medical Expert Testimony**

Dr. Peter Sack, a psychologist, testified that Dr. Brito's February 17, 2007 diagnosis of "major depressive disorder, recurrent psychotic," conflicted with her February 17, 2007 treatment note diagnosing dysthymia and her October 18, 2006 treatment note diagnosing cyclothymia.  (R. 487-88)  Dr. Sack testified that dysthymia and cyclothymia are much less severe conditions than "major depressive disorder, recurrent psychotic."  (R. 488)  He further noted that Dr. Brito did not identify any psychotic symptoms in her report diagnosing Belen with "major depressive disorder, recurrent psychotic."  (Id.)

Similarly, Dr. Sack noted that in July 2006, social worker Vargas diagnosed Belen with dysthymia, but in February and March 2007, Vargas diagnosed "major depressive disorder, recurrent psychotic" – again without noting any psychotic symptoms.[11]  (Id.)  Dr. Sack further found it inconsistent that although Belen was prescribed medication by Dr. Brito in February 2007, Vargas's notes indicate that Belen was not on any medication in February and March 2007.  (Id.)

Dr. Sack stated that he could not determine with a reasonable degree of medical certainty whether Belen's psychiatric impairment met or equaled the Listing of Impairments.  (R. 490)  Dr. Sack also testified that while – based on Belen's testimony – he believed she was

---

[11] Dr. Sack also noted that in a March 2007 psychiatric consultative examination report, Dr. Dubro specified that there was no evidence of psychosis.  (R. 488)

unable to work at the time of the hearing, he could not predict how long Belen's impairments

would last.  (R. 490-91, 495)

      **C.**    **Vocational Expert Testimony**

      Raymond Cestar, a vocational expert, testified that an individual the same age as

Belen, having the same educational and vocational background, and who was limited to light,

low-stress, simple work involving repetitive tasks, could find work as a cafeteria attendant, a

housekeeper, a clerical worker, or a ticket counter.  (R. 501-02)  Cestar also testified that a

person who misses three days or more of work per month would not be employable at any of

those jobs.  (R. 503)

      **D.**    **ALJ's Decision**

      The ALJ's decision denying Belen SSI benefits was issued on October 15, 2007.

(R. 9)  The ALJ concluded that Belen has not engaged in substantial gainful activity since the

date her application was filed, August 27, 2003.  (R. 14)  The ALJ found Belen's severe

impairments to be low back pain and an affective disorder, characterized as major depressive

disorder, dysthemia, and hypomanic bipolar disorder.  (Id.)  He found that her impairments did

not meet or medically equal any of the impairments listed in Appendix 1 to Subpart P of 20

C.F.R. Part 404.  (Id.)

      The ALJ found that Belen had a Residual Functional Capacity to perform a wide

range of light work, including simple and repetitive tasks in a low stress environment.  (R. 14)

He found that Belen's "medically determinable impairments could reasonably be expected to

produce the alleged symptoms," but that her "statements concerning the intensity, persistence

and limiting effects of these symptoms are not entirely credible."  (R. 16)  The ALJ did not give

Belen's treating physicians' testimony controlling weight.  (Id.)  He stated that their opinions

were inconsistent with "the objective medical findings showing complaints related to family issues."  (Id.)  He stated that there was no evidence that Belen's psychiatric impairments would last for the next twelve months.  (Id.)  The ALJ also cited Dr. Sack's testimony, asserting that it "does not support a finding of disability."  (Id.)  The ALJ further stated that Belen's "failure to adhere to her medication regimen also indicates that she has not had a psychiatric condition of such severity as to be disabling."  (Id.)

The ALJ found that while Belen was unable to perform her past relevant work, there were jobs in the national economy which Belen could hold, such as cafeteria attendant, cleaner/housekeeper, sedentary clerical worker, and ticket counter.  (R. 17-18)  The ALJ concluded that Belen has not been under a disability since the date her application was filed, August 27, 2003.  (R. 18)

## DISCUSSION

Belen and the Commissioner have moved for judgment on the pleadings.  Belen argues that the ALJ's finding that she is not disabled under Section 1614(a)(3)(A) of the Social Security Act is not supported by substantial evidence, because the ALJ did not properly evaluate the medical evidence in determining Belen's RFC.  The Commissioner argues that the ALJ properly found that Belen could perform certain jobs.

## I.   STANDARD OF REVIEW

"The Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion."  Bolden v. Comm'r, 556 F. Supp. 2d 152, 166 (E.D.N.Y. 2007) (citing Cutler v. Weinberger, 516 F.2d 1282, 1285 (2d Cir. 1975)).  "'A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal

error.'"  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (quoting Shaw v. Chater, 221 F.3d

126, 131 (2d Cir. 2000)); see also 42 U.S.C § 405(g).  "Substantial evidence means 'more than a

mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'"  Burgess, 537 F.3d at 127 (quoting Halloran v. Barnhart, 362 F.3d 28, 31

(2d Cir. 2004)).

        "[T]he findings of the Commissioner as to any fact, if supported by substantial

evidence, are conclusive. . . ."  Santiago v. Astrue, No. 06 Civ. 7860(CLC), 2007 WL 1982747, at

*3 (S.D.N.Y. July 3, 2007) (citing Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995)).  "If the

reviewing court finds substantial evidence to support the Commissioner's final decision, that

decision must be upheld, even if substantial evidence supporting the claimant's position also

exists."  Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan,

904 F.2d 122, 126 (2d Cir. 1990)).  "The role of the reviewing court is therefore quite limited

and substantial deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp.

2d at 454; see also Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (noting that the role of the

appellate court, like the district court, is to conduct a "plenary review of the administrative

record" and not "to determine de novo whether [the claimant] is disabled").  However, "[f]ailure

to apply the correct legal standards is grounds for reversal."  Townley v. Heckler, 748 F.2d 109,

112 (2d Cir. 1984).  "If the Commissioner failed to apply the correct legal standard in making a

determination, the reviewing court must not defer to the Commissioner's decision."  Johnson,

563 F. Supp. 2d at 453.

**II.   DEFINITION OF DISABILITY AND THE FIVE-STEP PROCESS**

**A.   Definition of Disability Under the Social Security Act**

A claimant is considered disabled under the Social Security Act (the "SSA" or "Act") if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  "A 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  The claimant's impairments must be of

> such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  Under the Act, "'work which exists in the national economy' means work which exists in significant numbers either in the region where [the claimant] lives or in several regions of the country."  (Id.)

**B.   The Five Step Evaluation Process for Determining Disability Under the SSA**

The Commissioner is required to follow a five-step process in evaluating disability claims.  See 20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has outlined the required analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities.  If the claimant suffers

> such an impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt.
> P, app. 1. . . . Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, she has the residual
> functional capacity to perform her past work.  Finally, if the claimant is unable to
> perform her past work, the burden then shifts to the Commissioner to determine
> whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (quoting Tejada v. Apfel, 167 F.3d

770, 774 (2d Cir. 1999)); see also 20 C.F.R. §§ 404.1520, 416.920.  The claimant bears the

burden of proof as to steps one through four; the Commissioner bears the burden of proof as to

step five.  Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004).

   In this case, the ALJ clearly delineated his findings concerning steps one through

three.  At step one, the ALJ concluded that Belen has not engaged in substantial gainful activity

since August 27, 2003.  (R. 14)  At step two, the ALJ found that Belen had two severe

impairments:  low back pain, and an affective disorder that has been diagnosed as major

depressive disorder, dysthemia, and hypomanic bipolar disorder.  (Id.)  At step three, the ALJ

examined the listings for musculoskeletal disorders and mental disorders, and found that Belen's

impairments did not correspond to a listing in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

416.920(d), 416.925 and 416.926).  (Id.)  Belen has not challenged the ALJ's findings as to steps

one through three, and they are therefore upheld.

   The ALJ then found that Belen had a residual functional capacity to perform a

wide range of light work, including simple and repetitive tasks in a low stress environment.  (R.

14)  At step four, the ALJ used this RFC to find that Belen could not perform her past work.  (R.

17)  Finally, at step five, the ALJ concluded that Belen could hold several jobs in the national

economy.  (R. 17-18)

Belen challenges the ALJ's RFC determination, as well as his subsequent finding

at step five.  The Government maintains that the ALJ's findings are supported by substantial

evidence and therefore must be upheld.

## III.  THE ALJ FAILED TO MAKE EXPLICIT FINDINGS AND TO CORRECTLY APPLY THE REGULATIONS

"A remand by the court for further proceedings is appropriate where 'the

Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have

correctly applied the regulations.'"  Bolden, 556 F. Supp. 2d at 161 (quoting Manago v.

Barnhart, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (collecting Second Circuit cases)).  Here,

the ALJ's determination requires remand for two reasons:  first, in declining to follow the

treating physician rule, the ALJ did not consider the necessary factors or comprehensively set

forth his reasoning.  Second, the ALJ failed to fulfill his obligations under SSR 82-59 in

considering Belen's non-compliance in taking her prescribed medication.

### A.  The ALJ Committed Error When Declining To Follow the Treating Physician Rule

"With respect to 'the nature and severity of [a claimant's] impairment(s),' 20

C.F.R. § 404.1527(d)(2), 'the SSA recognizes a 'treating physician' rule of deference to the

views of the physician who has engaged in the primary treatment of the claimant.'"  Burgess,

537 F.3d at 128 (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)); see also

Adorno v. Halter, No. 99 CIV 2758(HB), 2002 WL 59422, at *3 (S.D.N.Y. Jan. 16, 2002) ("A

'true retrospective diagnosis,' – i.e., a diagnosis of the claimant's condition during the relevant

period – is entitled to significant weight.").  In relevant part, the statute holds that if the

Commission "finds that a treating source's opinion on the issue(s) of the nature and severity of

[the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commission] will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).  "'[M]edically acceptable clinical laboratory diagnostic techniques' include consideration of '[a] patient's report of complaints, or history, [a]s an essential diagnostic tool.'"  Burgess, 537 F.3d at 128 (alterations in original) (quoting Green-Younger, 335 F.3d at 107).

   Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, "'the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with . . . the opinions of other medical experts.'"  Id. (quoting Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)); accord 20 C.F.R. § 404.1527(d)(2).  When a treating physician's opinion is not given controlling weight, the proper weight accorded depends upon four factors:  "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist."  Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)).  "Genuine conflicts in the medical evidence are for the Commissioner to resolve."  Venio v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).

   When an ALJ declines to give controlling weight to the opinion of a treating physician, he must "comprehensively" set forth his reasons for this approach.  Bolden v. Comm'r, 556 F. Supp. 2d at 166 (citing Halloran v. Barnhart, 362 F.3d 28, 32-33 (2d Cir. 2004)). The ALJ must then consider the factors set forth in Section 404.1527(d) and determine what, if any, weight will be given to the treating physicians' opinions.  Where an ALJ fails to explain the basis for his failure to defer to the treating physician, and does not perform the required analysis of the Section 404.1527(d) factors, "[t]he Second Circuit has emphasized that courts should 'not

hesitate to remand.'"  Id. (quoting Halloran, 362 F.3d at 22); see also Pogozelski v. Barnhart, 03

CV 2914(JG), 2004 WL 1146059, at *12 (E.D.N.Y. May 19, 2004) ("[T]he opinion of a treating

physician[] should have been accorded controlling weight, or if not, the ALJ was still required to

apply the factors specified in the regulations concerning treating physicians to determine the

degree of weight it deserved.  The failure to follow this rule, standing alone, requires

[r]emand.").

            Here, the ALJ failed to comprehensively set forth his reasons for declining to give

the treating physicians' opinions controlling weight.  Instead, the ALJ merely stated that "the

undersigned has not given the opinions of the claimant's treating sources controlling weight

because these opinions are inconsistent with the objective medical findings showing complaints

related to family issues."  (R. 16)  The ALJ did not explain what those inconsistencies were,[12]

nor did he conduct an analysis of the Section 404.1527(d) factors.  Cf. Bolden, 556 F. Supp. 2d

---

[12] There are, to be sure, portions of the record which cast doubt on the merits of Belen's claims.
A medical consultant and psychiatrist found that Belen was exaggerating her symptoms.  (R. 211
("claimant's statements partially credible but not to the extent alleged"), R. 273 ("Results of the
examination appear to be consistent with psychiatric problems, but in itself this does not appear
to be significant enough to interfere with the claimant's ability to function on a daily basis."))

    Belen's treating physicians also gave inconsistent diagnoses, and make findings that
contradict the record.  For example, in a report dated February 17, 2007, Belen is diagnosed with
"major depression, recurrent psychotic" (R. 279), while in another report bearing the same date
Belen is diagnosed with dysthymia.  (R. 299)  Belen is described as someone who is highly
compliant with respect to medication (see R. 243 (noting on May 16, 2006, that "Complian[ce]
With Treatment and/or Medications" was one of Belen's strengths)), while other entries indicate
that Belen is not taking her medication.  (See, e.g., R. 299 ("patient has not been tak[ing] her
meds for about 6 month[s]")).  Belen is described both as someone who "travels independently"
(R. 243) and as someone whose ability to use public transportation is "markedly limited."  (R.
266)  The medical opinions also diverge as to whether Belen's impairments will last twelve
months or longer.  (R. 232 (on February 12, 2004, will not last 12 months or more); R. 267 (on
July 26, 2006, will not last 12 months or more); R. 285 (on February 17, 2007, will last twelve
months or more); R. 462 (on March 13, 2008, will not last 12 months or more))  Belen's own
testimony is equivocal; she states that she is "okay until [her medication] wears off."  (R. 485)

    None of these issues is analyzed by the ALJ.

at 166 ("Yet not only did the ALJ fail to assign controlling or great weight to these opinions, she failed even to analyze them.  The ALJ did point to some scattered portions of the record tending to contradict the opinions of Dr. Davis and Dr. Fessler, but she in no way explained how or why the former evidence outweighed the latter.").  The ALJ's failure to comprehensively set forth his reasons, and failure to indicate what, if any, weight he did afford the treating physicians' opinions, is legal error that requires a remand.  See Pogozelski, 2004 WL 1146059, at *12 ("The failure to follow [the treating physician] rule, standing alone, requires [r]emand.").

On remand, the ALJ must consider all of the Section 404.1527(d) factors – which include, inter alia, (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist, see Clark, 143 F.3d at118 (citing 20 C.F.R. § 404.1527(d)) – to determine what weight should be given to the medical opinions of Belen's treating physicians.  If the ALJ declines to afford controlling weight to such opinions, he must comprehensively set forth his reasons why, including by explaining (1) what he considers the "objective medical findings" to be, (2) how the treating physicians' opinions are "inconsistent with the objective medical findings," and (3) why "complaints related to family issues" preclude a finding of disability.  (See R. 16)

### B.    The ALJ's Treatment of Non-Compliance Was Improper

In denying Belen's claim, the ALJ relied in part on Belen's refusal to follow prescribed treatment – i.e., failure to take her prescribed medication.  While non-compliance with a prescribed medication regimen may justify a denial of benefits, an ALJ making such a ruling must satisfy certain requirements set forth in SSR 82-59.

SSR 82-59 provides that:

[The Social Security Administration] may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist:

1.  The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) . . . ; and

2.  The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and

3.  Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and

4.  The evidence of record discloses that there has been refusal to follow prescribed treatment.

Where SSA makes a determination of "failure," a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable.

SSR 82-59, 1982 WL 31384 (1982).

As to the failure to follow prescribed treatment, the Social Security

Administration

may decide that it appears that the claimant or beneficiary does not have a good reason for failing to follow treatment as prescribed by a treating source and that the treatment is expected to restore ability to engage in any SGA [substantial gainful activity] (or gainful activity, as appropriate). However, before a determination is made, the individual . . . will be informed of this fact and of its effect on eligibility for benefits. The individual will be afforded an opportunity to undergo the prescribed treatment or to show justifiable cause for failing to do so.

It is very important that the individual fully understand the effects of failure to follow prescribed treatment. . . .

If the determination is made that "failure" did not occur until at least 12 months after onset, a period of disability may be established, with payment of benefits to continue as usual through the second month after the month disability ends.

Id.

Accordingly, under this ruling, "a claimant may be denied disability benefits if the

Secretary finds that [the claimant] unjustifiably failed to follow prescribed treatment and that if

[the claimant] had followed the treatment, [the claimant] would not be disabled under the Act."
Grubb v. Apfel, No. 98 CIV. 9032(RPP), 2003 WL 23009266, at *4 (S.D.N.Y. Dec. 22, 2003)
(citing McFadden v. Barnhart, No. 94 Civ. 8734(RPP), 2003 WL 1483444, at *8 (S.D.N.Y. Mar.
21, 2003)); accord 20 C.F.R. § 416.930(a); SSR 82-59.  "An individual who would otherwise be
found to be under a disability, but who fails without justifiable cause to follow treatment
prescribed by a treating source which the SSA determines can be expected to restore the
individual[']s ability to work, cannot by virtue of such 'failure' be found to be under a
disability."  Benedict v. Heckler, 593 F. Supp. 755, 759 (E.D.N.Y. 1984) (quoting SSR 82-59).

> Inherent in [SSR 82-59] is a threefold test, each part of which must be "failed" by
> plaintiff for him to be refused benefits.
>
> (1)  the treatment must be prescribed by his treating physician;
>
> (2)  such treatment must, according to SSA, restore his ability to work;
>
> (3)  he must have no justifiable cause to refuse treatment.

Id. (emphasis omitted).  The "burden of producing evidence concerning unjustified
noncompliance lies with the Secretary."  Grubb, 2003 WL 23009266, at *7 (quoting Preston v.
Heckler, 769 F.2d 988, 990 (4th Cir. 1985)).

The ALJ did not follow the standards set forth in SSR 82-59 when considering
Belen's refusal to follow prescribed treatment.  When an ALJ uses non-compliance with a
medication regimen as an express or implied basis for denying benefits, the requirements set
forth in SSR 82-59 must be met.  See Benedict, 593 F. Supp. at 759; Bolden, 556 F. Supp. 2d at
166.  Here, however, the ALJ stated – after declining to afford controlling weight to the
testimony of Belen's doctors – that Belen's "failure to adhere to her medication regimen also
indicates that she has not had a psychiatric condition of such severity as to be disabling."  (R. 16)
This sentence – the ALJ's only comment on Belen's alleged non-compliance – does not make

clear what role Belen's failure to take her prescribed medication played in the ALJ's decision, nor does it address the three-part test inherent in SSR 82-59.  Cf. Bolden, 556 F. Supp. 2d at 166 ("It is unclear from the decision whether the ALJ believed plaintiff's seizure disorder to be a remediable impairment that plaintiff failed to remedy without justifiable cause or whether the ALJ simply believed the seizure disorder was not severe enough to be considered disabling."). Although the ALJ implies that he found Belen's treatments were prescribed (see R. 15 (noting that "[Belen] was prescribed Depakote," "has had poor compliance with prescribed medications," and "was prescribed Zoloft, ambien [sic], and Depakote")), he did not address whether the medication would restore Belen's ability to work or whether there was a justifiable cause for her refusal to follow the prescribed treatment.

SSR 82-59 "emphasize[s] that the ALJ must provide claimant with (i) notice of the effect of noncompliance on his or her application for benefits, (ii) occasion to explain any seeming noncompliance, and (iii) opportunity to undergo the prescribed treatment."  Grubb, 2003 WL 23009266, at *5.  The ALJ did not notify Belen of the effect that non-compliance would have on her application for benefits, nor did he give Belen an occasion to explain any seeming non-compliance.  Nor did the ALJ determine whether the non-compliance occurred at least twelve months after onset of a disability, in which case "a period of disability may be established, with payment of benefits to continue as usual through the second month after the month disability ends."  SSR 82-59.

On remand, the ALJ must determine whether Belen's prescribed treatment would restore her ability to work, and whether she had justifiable cause for failing to take her

medication.[13]  He must also notify Belen of the effect that non-compliance may have on her

application for benefits, and she must be "afforded an opportunity to undergo the prescribed

treatment or to show justifiable cause for failing to do so."  SSR 82-59.  Finally, the ALJ must

determine whether Belen's non-compliance occurred at least twelve months after onset of a

disability.

## CONCLUSION

For the foregoing reasons, both Plaintiff's and Defendant's motions for judgment

on the pleadings are DENIED (Dkt. Nos. 9, 15), and the case is remanded for further

proceedings.

Dated: New York, New York  
      July 12, 2011

SO ORDERED.

*Paul G. Gardephe*

Paul G. Gardephe  
United States District Judge

---

[13] When considering non-compliance with treatment, mental impairments require a different standard than physical impairments.  When a plaintiff refuses to follow a treatment regimen, the "refusal . . . must be reasonable," but the "reasonable man" standard – which is normally used in determining justifiable cause for refusal – is "clearly not applicable" to those persons who, because of mental impairments, are not "reasonable."  Benedict, 593 F. Supp. at 761; see also Frankhauser v. Barnhart, 403 F. Supp. 2d 261, 278 (W.D.N.Y. 2005) ("Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized that psychological and emotional difficulties may deprive a claimant of 'the rationality to decide whether to continue treatment or medication.'" (quoting Thompson v. Apfel, No. 97CIV7697(LAK)(JCF), 1998 WL 720676, at *6 (S.D.N.Y. Oct. 9, 1998))).  For this reason, "[i]n cases involving the mentally ill, 'justifiable cause' must be given a more lenient, subjective definition."  Benedict, 593 F. Supp. at 761.  Indeed, the "mere fact that the listed impairments include numerous mental disorders shows the Secretary's 'progressive attitude toward mental illness.'"  Id. (quoting Rivera v. Schweiker, 560 F. Supp. 1091, 1095 (S.D.N.Y. 1982)).